IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 15, 2015

## PAUL E. ISAAC v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 103905    Bobby Ray McGee, Judge**

---

**No. E2015-01119-CCA-R3-PC – Filed January 11, 2016**

---

The Petitioner, Paul E. Isaac, appeals as of right from the Knox County Criminal Court's denial of his petition for post-conviction relief from his guilty-pled convictions for two counts of aggravated assault, attempted aggravated robbery, and misdemeanor assault. On appeal, the Petitioner contends that trial counsel was ineffective because he was not adequately prepared for trial, and the Petitioner's lack of confidence in trial counsel led him to plead guilty. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Paul E. Isaac.

Herbert H. Slatery III, Attorney General and Reporter; Meredith DeVault, Senior Counsel; Charme P. Allen, District Attorney General; and Ta Kisha Monette Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

On October 28, 2013, the Petitioner entered guilty pleas in several cases pursuant to a plea agreement with the State. The Petitioner pled guilty as follows: (1) aggravated assault in Case Number 102177 (Count 9) in exchange for a six-year sentence, which would run consecutively to a sentence that the Petitioner was already serving in another case; (2) attempted aggravated robbery also in Case Number 102177 (Count 10) with a six-year sentence set to run consecutively to the aggravated assault; (3) aggravated

assault in Case Number 101401 in exchange for a six-year sentence to be served concurrently with the sentences in Case Number 102177; and (4) misdemeanor assault with a sentence of eleven months and twenty-nine days, also set to run concurrently.[1] Thus, the Petitioner received a total effective sentence of twelve years with thirty-five percent release eligibility.

At the plea submission hearing, the prosecutor provided the following factual bases underlying the Petitioner's charges:

> The testimony would be that Ms. Kecia Ross knew [the Petitioner]. That -- the proof would be that they had been out earlier that night with some buddies. That, in the course of that night, she was seen putting money that she had in her boot.
>
> The proof would be that on the morning of March 18th, 2012, she was walking to her apartment, holding her child, Daylon Ross. And further proof would be that [the Petitioner] came up behind her, had a gun to the back of her head, making a demand for money.
>
> Further proof would be that he put her in a chokehold. That, because of the chokehold she passed out. He did not get her money out of her boot. When she came to, she found her child, that couldn't walk, up on the bed.
>
> Further proof would be that, after [the Petitioner] made bond on these matters, at the time, [the Petitioner] was in a relationship with Kara Rhodes. And that on October 20th, 2012, that [the Petitioner] and Ms. Rhodes had a disagreement.
>
> The proof would be that [the Petitioner] threatened Ms. Rhodes with a weapon. She called the police and the police responded.
>
> Further proof would be that on November 11th, 2012, that, again, [the Petitioner] and . . . Ms. Rhodes were together and there was a disagreement, and that [the Petitioner] did assault Ms. Rhodes.

The Petitioner stipulated to the facts recounted by the State. The trial court then engaged the Petitioner in a plea colloquoy. The Petitioner denied being under the influence of any drugs that would affect his ability to understand the proceedings. The

---

[1] We glean these details from the transcript of the guilty plea submission hearing; the judgments of conviction were not included in the record on appeal.

-2-

Petitioner affirmed that the agreement announced by the prosecutor matched his understanding of the terms of his plea agreement. He said that he understood his guilty-pleaded convictions would be on his permanent record and could thereafter be used to enhance sentences if he had any convictions in the future.

The Petitioner agreed that he had reviewed the petition to plead guilty with his attorney and that he understood the contents of the petition. The Petitioner indicated that he understood that by pleading guilty he was waiving "very important rights," including the rights to a jury trial, to confront the witnesses against him, to cross-examine the State's witnesses, and to remain silent. The Petitioner stated that he knew after he pled guilty there would be no further proceedings or hearings to determine his guilt.

The Petitioner responded affirmatively when asked whether he was entering into the plea agreement "freely, voluntarily, and knowingly." The Petitioner said that no one had threatened him or promised him anything other than what was contained in the plea offer in exchange for his guilty pleas. The Petitioner affirmed that he was pleading guilty because he was in fact guilty. He also stated that he was satisfied with his attorney's performance. The Petitioner had no questions about his plea agreement or the rights he was waiving. The court accepted the Petitioner's guilty pleas and imposed sentences in accordance with the plea agreement.

On July 22, 2014, the Petitioner filed a pro se petition seeking post-conviction relief, which was later amended following the appointment of counsel. The amended petition alleged that the Petitioner's guilty pleas were involuntary and unknowing because "trial counsel failed to file pre-trial motions to exclude witness statements . . . or a pre-trial motion to dismiss the charges," and the failure to file these motions "left [him] without confidence that he would have effective representation at trial . . . ." Further, the Petitioner contended that "he did not adequately understand the evidence against him and therefore could not sufficiently evaluate the favorability" of the plea offer. The post-conviction court held an evidentiary hearing on May 12, 2015.

The Petitioner testified that prior to the entry of his guilty pleas, he met with trial counsel three times. He stated that the "[m]ajority" of their conversations concerned the State's plea offers rather than the factual details of his cases. However, later in his testimony, the Petitioner testified that he "thoroughly" discussed the facts of both "incidents" with trial counsel. The Petitioner said that he was aware of the charges against him. According to the Petitioner, trial counsel told him that if the cases went to trial, the Petitioner would be convicted. The Petitioner claimed that trial counsel provided no explanation for his prediction that the Petitioner would lose if the cases went to trial. The Petitioner, however, testified that he believed he would have been successful

at trial. He based this belief on the fact that he had "been arrested twice on this charge"[2] and "[t]he witness failed to prosecute or come to court . . . ."

The Petitioner admitted that he had been charged with assaulting both Kecia Ross and Kara Rhodes on separate occasions, both of whom he knew prior to the assaults. According to the Petitioner, Ms. Ross did not appear in court when his cases were still in general sessions, and, thus, he did not believe that she would have testified against him had his case gone to trial. However, the Petitioner knew Ms. Ross was in custody at the time his cases were slated to go to trial and was therefore available as a witness for the State.

When asked why he thought a motion to dismiss would have been successful given that the State had the witness available, the Petitioner stated that he nevertheless "felt misrepresented because [he] told [trial counsel] to file [his] motion and he didn't do it." He said that this "made [him] feel used," like he "wasn't being represented how [he] should have" been, and like trial counsel "wasn't doing what [the Petitioner] asked him to." The Petitioner thought that the motion should have been filed because there was always a possibility that Ms. Ross would refuse to testify. The Petitioner opined that "she couldn't have wanted to testify if she never came" to court. According to the Petitioner, Ms. Rhodes was facing charges in another case, and when she appeared in court on those charges, she stated that she would not testify against the Petitioner. The Petitioner testified that the State had to obtain a "material witness warrant" to compel her testimony at his impending trial.

With respect to pretrial discovery, the Petitioner asserted that trial counsel only showed him a statement given by Ms. Ross and "pictures on a floppy disc" but otherwise did not show him anything "pertaining to the case or nothing [sic] like that." However, he subsequently testified that trial counsel also showed him printed photos of "poor quality."[3]

According to the Petitioner, he told trial counsel "the whole time" that he "wasn't going to take no [sic] plea." The Petitioner testified that at their first meeting, trial counsel relayed an initial offer from the State of twenty years at thirty percent. However, the Petitioner told trial counsel that he "wasn't going to take no [sic] [twenty]." The

---

[2] The Petitioner had multiple charges pending, and it is unclear which charged he was referring to in this instance.

[3] Although unclear from the testimony, it appears that the pictures depicted the victims' injuries. We base this assumption on Petitioner's statement that he could not identify specific injuries from the "individuals" in the pictures, but no other details of the photographs were provided.

Petitioner testified that he also rejected offers of eight years at one-hundred percent and fifteen years at thirty-five percent. At his third meeting with trial counsel, counsel relayed the State's plea offer of twelve years at thirty-five percent.

The Petitioner stated that he accepted the twelve-year offer because the State had filed a superseding indictment charging him with a "gang enhancement" just before his trial was set to start. He said the indictment "was something . . . [he] had no knowledge of" and trial counsel "had no knowledge of," "so it was a lot of pressure" and his pleas "w[ere] kind of force[d]." The Petitioner said that trial counsel informed him that the prosecutor would not make him a plea offer for ten years or less, and he told trial counsel that he would not accept anything more than ten years. Therefore, when the prosecutor did make an offer of twelve years at thirty-five percent, "that was what [he] ran with." When asked what ultimately convinced him to accept the plea offer, he replied, "It sounded good . . . [b]ecause it was lower [than fifteen years]."

The Petitioner testified that at the time he accepted the plea, he "[h]onestly" did "not really" think that trial counsel would represent him well if he chose to go to trial. However, he did understand that he had the right to reject the offer and proceed to trial. Nevertheless, he was worried that trial counsel would not represent him "to his best ability" because "a [twelve-year sentence at thirty-five percent] for a first time offender, that's excessive. That's not - - that's not being represented . . . to his best ability." He testified that his feeling about the offer he accepted was not a matter of "being [un]happy," but, rather, it was "not right." He continued that it was "not right that [he] get a Range II" because he had "never been charged as an adult," and, in his mind, he was actually "eligible for Range I." However, the Petitioner also testified that he understood that, even if he had been convicted as charged and sentenced as a Range I offender, he would have faced "considerably more time than" twelve years. Also, according to the Petitioner, trial counsel explained sentencing ranges to him, and at the time he pled guilty, the Petitioner understood that his sentencing range was based on a Range II classification due to his juvenile convictions.[4]

The Petitioner and trial counsel discussed the possibility that Ms. Ross and Ms. Rhodes would not testify. The Petitioner opined that trial counsel thought the women would testify against the Petitioner, but the Petitioner continued to believe that they would not. When asked why he accepted the plea deal in light of his belief that the victims would not testify against him, the Petitioner stated that the prosecutor had filed a superseding indictment "for gang enhancement." Trial counsel moved to reset the trial

---

[4] Although difficult to discern, the Petitioner's argument seems to be that he understood the terms of his plea agreement when he entered his pleas but that he has since come to believe that his juvenile convictions did not in fact qualify him for a Range II classification.

date in light of the superseding indictment, and the prosecutor then backtracked, agreeing to drop the gang enhancement and proceed to trial as previously scheduled.

The Petitioner testified that he immediately regretted accepting the plea offer. According to the Petitioner, trial counsel knew that he did not want to accept the offer. He explained that he did not inform the trial court of his misgivings about the offer at the plea submission hearing because he "felt like it was a waste of time anyway."

The Petitioner understood that if he was granted post-conviction relief, his judgments of conviction would be vacated, the plea agreement would be null, his original charges would be restored—including a charge for especially aggravated kidnapping— and he would face the possibility of a much longer sentence if he were convicted at trial. Nevertheless, the Petitioner wished to pursue his post-conviction claims.

The Petitioner testified that he "knew [trial counsel] wasn't going to be able to represent him to his full capacity from when [the Petitioner] first met him." According to the Petitioner, this affected his decision to plead guilty because trial counsel "wasn't going to do his best anyway." When asked what else trial counsel should have investigated in order to prepare for trial, the Petitioner said, "[T]here wasn't too much they could find out, because it's bogus."

Trial counsel testified that he began representing the Petitioner on "a lot of cases" in general sessions court. He stated that they "litigated some of those cases in sessions court," and "[e]verything was ultimately bound over to criminal court." The Petitioner was incarcerated while his cases were pending, and trial counsel met with him at the detention center. He described their first meeting as a "very long, extensive introductory interview process, social history, all that kind of stuff." He testified that the Petitioner had "a lot of cases at once" with "a lot of moving parts." According to trial counsel, "the cases themselves may have been relatively simple from a fact standpoint," but "there were still a lot of things going on to try to track witnesses down, that kind of stuff."

Trial counsel remembered meeting with the Petitioner more than three times at the detention facility. Also, he received funding to hire an investigator, Michael Cohan, to assist in his preparation of the case. He testified that Mr. Cohan's assistance was "very helpful" although "[unfortunately], not very fruitful." Mr. Cohan accompanied trial counsel to meet with the Petitioner, and they "went over the discovery, went over the notice of enhancement . . . , [and] talked at length about witness availability." According to trial counsel, Ms. Ross had been brought to Tennessee on a detainer from out of state and was in custody. After receiving permission from Ms. Ross's attorney, Mr. Cohan spoke with her and told trial counsel that, in his opinion, she would be a good witness. According to trial counsel, "that's really what this case came down to."

-6-

Trial counsel testified that "the Kara Rhodes case [was] not very factually difficult, but essentially came down to a swearing contest. She said he did it, he said he didn't . . . ." Trial counsel said his plan was to "find the other people that [the Petitioner] had been around [on] the date of the offense," but they "kept hitting dead ends" and could not establish an alibi for the Petitioner.

Trial counsel said that he was concerned the jury would accredit the victims' testimony and convict the Petitioner. Trial counsel testified that the Petitioner was facing "very serious charges and his exposure was quite high." According to trial counsel, he discussed these concerns with the Petitioner "on multiple occasions."

Trial counsel testified that he was simultaneously investigating the case and preparing for trial while negotiating plea offers with the prosecutor. According to trial counsel, he communicated the Petitioner's "demands" to the prosecutor, and they eventually arrived at the offer that the Petitioner accepted—twelve years at thirty-five percent. Trial counsel said that the decision to accept the plea offer was the Petitioner's alone.

Thereafter, the post-conviction court orally denied post-conviction relief. The court rejected the Petitioner's claim that his plea was unknowing and involuntary, noting that "he obviously knows a great deal about sentencing and about ranges . . . [a]nd he was told repeatedly" that his potential exposure was twenty-five to forty years. The court found that there was no validity to the Petitioner's post-guilty plea concern that he was improperly classified as a Range II offender, which it said he was "simply wrong about."

The court accredited trial counsel's testimony that the State had taken steps to ensure that both victims would be available to testify against the Petitioner. Therefore, the Petitioner's belief that they would not testify was unfounded. Likewise, the court accredited trial counsel's testimony that Mr. Cohan spoke with at least one of the witnesses and concluded that her testimony "would be very damaging."

The court characterized the Petitioner's concern that trial counsel would not represent him effectively at trial as "pure speculation," noting that "[t]here [was] absolutely no evidence to support that."

The court concluded that the Petitioner's plea was knowing and voluntary. The court noted that the Petitioner "got from what could have been a maximum exposure of [forty] years at [one-hundred] percent down to [twelve] years at . . . [thirty-five percent] . . . . He got a very good deal, as they say." The court further found that the Petitioner had "demonstrated nothing" indicating that there "was anything improper, wrong, or inadequate about the representation he got, [or] about the advice he got, or about the

-7-

result he got." The court said that it "appear[ed] that just when the dust settled, he just - - just kind of regrets that he's going to be in jail for [twelve years] at [thirty-five] percent."

It is from this decision that the Petitioner now timely appeals.

ANALYSIS

On appeal, the Petitioner contends, generally, that the post-conviction court erred when it denied him relief. He argues that trial counsel failed to adequately prepare for trial, that the Petitioner had no confidence in counsel's ability to represent him effectively at trial, and that the Petitioner therefore entered a guilty plea. The State responds that the post-conviction court correctly concluded that the Petitioner failed to carry his burden of proving that trial counsel was ineffective or that his guilty pleas were unknowingly or involuntarily entered.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the

evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

In the context of a guilty plea, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

The Petitioner contends that he lacked confidence in trial counsel's ability to represent him effectively at trial; thus, he felt he had no option but to accept the State's plea offer. However, the testimony from the evidentiary hearing belies this contention. Counsel testified that he worked closely with Mr. Cohan and met with the Petitioner multiple times. The Petitioner's own testimony was that he and trial counsel thoroughly discussed the facts underlying his cases. Although the Petitioner apparently believes that counsel should have filed the motion to dismiss that he requested, there is absolutely no evidence that such a motion would have been granted. The Petitioner inexplicably believed that Ms. Ross and Ms. Rhodes would not testify against him even though the State went to great lengths to ensure they would be available at trial. The Petitioner's own testimony was that the State had obtained a material witness warrant to ensure Ms. Rhodes would testify at his trial; yet, he remained convinced that she would not have actually testified against him. Also, the State pursued a detainer action against Ms. Ross, having her brought to Tennessee from another state to procure her testimony. Therefore, the Petitioner's insistence that the victims would not have testified against him and, thus, that a motion to dismiss should have been filed, was completely unfounded. Trial counsel's refusal to file a motion to dismiss was a reasonable, strategic decision, which we will not second-guess. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

There is also no support in the record for the Petitioner's belief that trial counsel would not effectively represent him at trial. As the post-conviction court noted, that belief is "purely speculation," with "absolutely no evidence to support" it. Trial counsel worked with a private investigator and attempted to track down witnesses who might provide the Petitioner with an alibi, although those attempts were fruitless. Trial counsel was understandably concerned that, if the cases went to trial, it would be a "he said, she said" situation, and there was a risk that the jury would simply accredit the testimony of

the victims. And, although the Petitioner questioned counsel's ability to adequately represent him, trial counsel was able to negotiate the State down from an initial offer of twenty years at thirty percent to the offer ultimately agreed to, twelve years at thirty-five percent. Although the Petitioner seems to have some lingering concerns about his status as a Range II offender, he admitted that trial counsel explained that his sentences were based on a Range II classification.

Finally, at the guilty plea submission hearing the Petitioner indicated his understanding of the plea agreement and affirmed his desire to plead guilty to the charges. He also stated that he was satisfied with counsel's representation. "Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). "A petitioner's sworn responses to the litany of questions posed by the trial judge at the plea submission hearing represent more than lip service. Indeed, the petitioner's sworn statements and admission of guilt stand as a witness against the petitioner at the post-conviction hearing when the petitioner disavows those statements." Alfonso C. Camacho v. State, No. M2008-00410-CCA-R3-PC, 2009 WL 2567715, at *7 (Tenn. Crim. App. Aug. 18, 2009). Accordingly, the Petitioner has failed to prove that trial counsel was ineffective such that his pleas were rendered unknowing and involuntary. The Petitioner is not entitled to relief.

## CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE